1   DAVID L. ANDERSON (CABN 149604)
    United States Attorney
2

3   HALLIE HOFFMAN (CABN 210020)
    Chief, Criminal Division
4

5   MICHAEL A. RODRIGUEZ (NYBN 4938262)
    Assistant United States Attorney
6
        1301 Clay Street, Suite 340S
7       Oakland, California 94612
        Telephone: (510) 637-3717
8       FAX: (510) 637-3724
        Michael.Rodriguez@usdoj.gov
9

10  Attorneys for United States of America

11              UNITED STATES DISTRICT COURT

12             NORTHERN DISTRICT OF CALIFORNIA

13                   OAKLAND DIVISION

14  UNITED STATES OF AMERICA,          )   CASE NO. CR 12-161 YGR
                                       )
15          Plaintiff,                 )
                                       )   UNITED STATES' OPPOSITION TO
16      v.                             )   DEFENDANT'S MOTION FOR
                                       )   COMPASSIONATE RELEASE
17  QUENTEL REED,                      )
                                       )
18          Defendant.                 )
                                       )
19  _____   )
                                       )
20

21

22

23

24

25

26

27

28

GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE
CR 12-161 YGR

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................1

RELEVANT BACKGROUND ..........................................................................................2

I.     A.     Reed's Criminal Conduct and Procedural Background ........................................2

        B.     FCC Lompoc's Efforts to Contain COVID-19 Infections ...................................2

        C.     Reed's Health Condition................................................................................4

        D.     Reed's Request to the Warden for Compassionate Release .................................6

II.     THIS COURT MAY NOT DESIGNATE REED TO HOME CONFINEMENT ..........................7

III.     REED HAS EXHAUSTED HIS ADMINISTRATIVE REMEDIES, WHICH IS A JURISDICTIONAL REQUIREMENT ................................................................................8

        A.     More than 30 Days have Passed Since Reed's Informal Request for a Modification of His Sentence was Received by FCC Lompoc's Warden ..........................8

        B.     The First Step Act Requires Exhaustion of Administrative Remedies, Which is a Jurisdictional Limitation................................................................................8

IV.     REDUCTION OF REED'S SENTENCE IS NOT WARRANTED ...........................................10

        A.     The Sentencing Commission's Policy Statements Are Controlling .................................10

        B.     Reed is a Danger to the Community.................................................................13

        C.     Reed Has Not Presented Extraordinary and Compelling Reasons for His Release ..............................................................................................14

        D.     Section 3553(a) Factors Weigh Against Reed's Release.................................18

V.     IF THIS COURT MODIFIES REED'S SENTENCE – WHICH IT SHOULD NOT – THE COURT SHOULD MODIFY THE SENTENCE TAKING INTO ACCOUNT THE MANY IMPORTANT INTERESTS AT PLAY ................................................................19

CONCLUSION..................................................................................................................21

# TABLE OF AUTHORITIES

Cases

*Dillon v. United States*, 560 U.S. 817 (2010) ......................................................... 10

*Reeb v. Thomas*, 636 F.3d 1224 (9th Cir. 2011) ...................................................... 9

*Shaw v. Bank of America Corp.*, 946 F.3d 533 (9th Cir. 2019) ................................ 10

*Tapia v. United States*, 564 U.S. 319 (2011) ............................................................ 8

*United States v. Addonizio*, 442 U.S. 178 (1979) .................................................... 10

*United States v. Ayon-Nunez*, 2020 WL 704785 (E.D. Cal. Feb. 12, 2020) ............ 14

*United States v. Bess*, No. 16-CR-156, 2020 WL 1940809 (W.D.N.Y. Apr. 22, 2020)........................... 11

*United States v. Buenrostro*, 895 F.3d 1160 (9th Cir. 2018) ................................... 10

*United States v. Cazarez*, No. 15-CR-00362-CRB-1, Dkt. 78 (N.D. Cal. May 4, 2020)…………….....13

*United States v. Ceballos*, 671 F.3d 852 (9th Cir. 2011) ......................................... 9

*United States v. Davis*, 825 F.3d 1014 (9th Cir. 2016)............................................. 10

*United States v. Fobbs*, No. 19-CR-410 WHA, Dkt. 32 (N.D. Cal. Apr. 7, 2020…………………........7

*United States v. Gileno*, No. 19-CR-161-VAB-1, 2020 WL 1307108, at *3-*4 (D. Conn. Mar. 19, 2020)

*United States v. Greenhut*, 2020 WL 509385 (C.D. Cal. Jan. 31, 2020).................................. 13

*United States v. Holden*, No. 13-CR-00444-BR, 2020 WL 1673440 (D. Or. Apr. 6, 2020).................... 11

*United States v. Jones*, No. CR 17-070 VC, Dkt. 93 (N.D. Cal. Apr. 10, 2020)…………………..........7

*United States v. Lopez*, 104 F.3d 1149 (9th Cir. 1997).............................................. 20

*United States v. Mangarella*, 2020 WL 1291835 (W.D.N.C. Mar. 16, 2020)................................. *passim*

*United States v. Neman*, No. 14-CR-521-JAK, Dkt. 863, at 4-6 (C.D. Cal. Mar. 30, 2020)……………10

*United States v. Raia*, 954 F.3d 594 (3d Cir. 2020)................................................... 14

*United States v. Robinson*, No. 18-CR-00597 RS, Dkt. 33 (N.D. Cal. Apr. 27, 2020)…………………10

*United States v. Shah*, No. 10-CR-70-CJC, Dkt. 329 (C.D. Cal. Mar. 30, 2020)…………….....…10

*United States v. Smartt*, 129 F.3d 539 (10th Cir. 1997)........................................... 10

*United States v. Sprague*, 135 F.3d 1301 (9th Cir. 1998)......................................... 13

1

*United States v. Washington*, 549 F.3d 905 (3d Cir. 2008) ................................................ 10

*United States v. Weidenhamer*, 2019 WL 6050264 (D. Ariz. Nov. 8, 2019) .......................... 14

*United States v. Zahn*, No. CR 18-150 JD, Dkt. 51 (May 18, 2020)…………………………………17

*Weinberger v. Salfi*, 422 U.S. 749 (1975) .......................................................................... 10

2

3

4

5

Statutes

6

18 U.S.C. 3582(c)(1)(A) .................................................................................................. *passim*

7

18 U.S.C. § 922(g)(1) .............................................................................................................. 3

8

18 U.S.C. § 924(c)(1)(A) .......................................................................................................... 3

9

18 U.S.C. § 3142(g) ............................................................................................................... 14

10

18 U.S.C. § 3142(g)(1) .......................................................................................................... 14

11

18 U.S.C. § 3553(a) ............................................................................................................... 19

12

18 U.S.C. § 3582(c)(1) ........................................................................................................... 10

13

18 U.S.C. § 3582(c)(2) ....................................................................................................... 4, 10

14

18 U.S.C. § 3624(c) ............................................................................................................ 3, 8

15

18 U.S.C. § 3621(b) ................................................................................................................. 9

16

18 U.S.C. § 3624(c)…………………………………………………………………………………9

17

21 U.S.C. §§ 841(a)(1) ............................................................................................................. 3

18

28 U.S.C. § 994(t) ................................................................................................................. 12

19

Pub. L. No. 116-136 ............................................................................................................... 11

20

21

Rules

22

U.S.S.G. § 1B1.13 ...................................................................................................... 13, 14, 15

23

U.S.S.G. § 4B1.1 .................................................................................................................... 15

24

25

26

27

28

# INTRODUCTION

On March 7, 2013, this Court sentenced defendant Quentel Reed to 180 months in prison and three years of supervised release for possession of a firearm in furtherance of drug trafficking. Reed is currently in the custody and care of the Bureau of Prisons ("BOP") at the Federal Correctional Institute in Lompoc, California ("FCI Lompoc"[1]). Reed's anticipated release date is April 13, 2025, and BOP medical records have confirmed that he is 38 years old and is not currently in any elevated risk category for COVID-19. While Reed was previously diagnosed with adult-onset type II diabetes and essential hypertension, those diagnoses were resolved years ago. Specifically, Reed's diabetes diagnosis was resolved in May 2014 and his hypertension was resolved in April 2016, and BOP medical records show that he has needed neither treatment nor medication for either condition since that time. BOP medical records also indicate that at no point in the last several years has Reed ever complained about diabetes or hypertension. In sum, Reed is a 38-year-old man with absolutely nothing in his medical history suggesting he currently has any conditions that would increase his likelihood of contracting COVID-19, or that he would suffer severe complications in the event he was infected. When Reed was tested for COVID-19 on May 6, 2020, the results were negative.

Reed moves for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) and seeks to be released from custody after serving approximately half of his original sentence. The government opposes Reed's motion. First, in light of COVID-19, the BOP has undertaken an urgent effort to evaluate all inmates for home confinement during their custodial sentence, which BOP has exclusive authority to designate under 18 U.S.C. § 3624(c). This Court should defer to that process. Second, Reed has not met the high bar of showing he substantively warrants such relief. While COVID-19 is a global pandemic, it does not constitute an "extraordinary and compelling" reason warranting immediate release from custody. Finally, the factors set out in Section 3553(a) of Title 18 of the United States Code and the Sentencing Guidelines establish that Reed is a danger to the community and his release plan fails to protect the community. This Court should deny Reed's motion.

---

[1] FCI Lompoc is a BOP facility within the larger Federal Correctional Complex at Lompoc ("FCC Lompoc"). FCC Lompoc includes FCI Lompoc, which is a low-security prison where Reed is housed, as well as the medium-security United States Penitentiary Lompoc ("USP Lompoc").

**RELEVANT BACKGROUND**

**I.    A.    Reed's Criminal Conduct and Procedural Background**

On March 8, 2012, Reed was charged in a three-count indictment for possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1), possession with intent to distribute cocaine base, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(iii), and possession of a firearm in furtherance of drug trafficking, in violation of 18 U.S.C. § 924(c)(1)(A).  Dkt. 2.  The charges stemmed from a February 9, 2012 incident in Oakland where officers arrested Reed after he was found carrying a loaded 9mm pistol containing a high capacity magazine and 59 grams of cocaine base.  Dkt. 18.  The cocaine was divided into separate packaging, including at least 75 individually wrapped rocks of cocaine base.  *Id*.  Pursuant to a Rule 11(c)(1)(B) plea agreement, on November 1, 2012, Reed pled guilty to possessing a firearm in furtherance of drug trafficking.  *Id*.

The Presentence Investigation Report ("PSR") noted that Reed had sustained four prior felony convictions, including three for controlled substance violations.  PSR ¶¶ 25, 28-30.  The parties and Probation agreed that the Career Offender Guidelines were applicable.  Dkt 18 at ¶ 7; PSR ¶ 34.  Reed's Guidelines range was 262 to 327 months, and given his "lengthy and serious criminal history," Probation recommended a sentence of 262 months.  *See* PSR Recommendation.  At the sentencing hearing, Reed and the government jointly recommended a below-Guidelines sentence of 180 months.  Dkt. 21-22.  On March 7, 2013, Your Honor sentenced Reed to 180 months to be followed by three years of supervised release.  Dkt. 23-24.  Counts one and two of the indictment were dismissed upon motion by the government.  *Id*.  Reed is presently serving his sentence at low-security FCI Lompoc, with a projected release date in April 2025.  https://bop.gov/inmateloc/.

In June 2015 and again in January 2016, Reed moved the Court for a reduction in his sentence pursuant to 18 U.S.C. § 3582(c)(2).  Dkt. 32, 35.  This Court denied both motions.  Dkt. 34, 37.

**B.    FCC Lompoc's Efforts to Contain COVID-19 Infections**

On March 13, 2020, BOP instituted significant measures to prevent the spread of COVID-19 at its facilities, including implementing restrictions on visitation, inmate movement, and transfers, and increasing health screenings of inmates and staff.  Declaration of Michael A. Rodriguez ("Rodriguez

Decl."), Ex. A (March 24, 2020 BOP Press Release).  BOP also instituted a mandatory 14-day quarantine for all new inmates entering a BOP facility.  *Id*.

On March 31, 2020, BOP announced that every inmate would be secured in their cells for 14 days.  Rodriguez Decl., Ex. B (March 31, 2020 BOP Press Release).  Around this same time period, FCC Lompoc's first inmate tested positive for COVID-19.  Rodriguez Decl., Ex. C (May 4, 2020 BOP Press Release).  Shortly thereafter, in early April 2020, BOP began constructing a hospital care unit ("HCU") at FCC Lompoc.  *Id*.  Construction of the HCU included a complete renovation of a decommissioned prison factory.  *Id*.  The HCU was completed in less than four weeks and is comprised of 10 double-occupancy, acute care treatment rooms with negative pressure, as well as a patient intake room, nurse's station, pharmacy, linen exchange room, biohazard room, and medical supply and storage area.  *Id*.  It also includes an officer's station, staff lounge, and staff locker room containing shower stalls to mitigate the risk of exposure to COVID-19.  *Id*.  Additionally, FCC Lompoc negotiated a new contract for medical personnel to assist the prison's medical staff with COVID-19 treatment and prevention.  *Id*.  This contract included retaining a number of doctors, nurses, paramedics, physician assistants, and nurse assistants to provide treatment at the prison, as well as a pharmacist and a clinical manager.  *Id*.

In an April 17, 2020 memorandum from the acting warden at FCC Lompoc, all inmates and staff were instructed that they were required to wear BOP-issued masks at all times and that inmates were being provided with disinfectant for their living spaces.  Rodriguez Decl., Ex. D (April 17, 2020 Von Blanckensee Memo.).  Included in the memorandum were directives that inmate movement would be severely restricted and that sharing of personal items was now prohibited.  *Id*.  Inmates who failed to wear protective masks or properly disinfect their housing areas were subject to disciplinary action.  *Id*.

On May 5, 2020, BOP announced that every inmate at low-security FCI Lompoc would be tested for COVID-19.  Rodriguez Decl., Ex. E (May 5, 2020 BOP Press Release).  BOP noted that social distancing was difficult to achieve at FCI Lompoc because the inmates lived in a dormitory-style setting. *Id*.  To mitigate the risk of exposure, BOP officials placed over 250 beds in an alternative housing location to create space and provide a quarantine area.  *Id*.  Prison staff also repurposed the gymnasium, chapel, visiting room, and a decommissioned factory to create additional housing space for inmates.  *Id*.

1    All personnel entering the prison complex are required to undergo screenings where their temperature is

2    checked and they are evaluated for any COVID-19 symptoms. *Id*. Additionally, BOP announced that

3    FCC Lompoc had an ample supply of personal protective equipment for inmates and staff. *Id*.

4        As of May 22, 2020, there were 291 inmates and 8 staff members at FCI Lompoc with an active

5    diagnosis of COVID-19. *See* https://www.bop.gov/coronavirus/. At medium-security USP Lompoc, 57

6    inmates and 16 staff have an active COVID-19 diagnosis. *Id*.

7        **C.**     **Reed's Health Condition**

8        BOP medical records, as communicated to undersigned counsel by BOP counsel in connection

9    with this motion, show that Reed is 38 years old and was previously diagnosed with hypertension and

10    diabetes. Rodriguez Decl., Ex. F (Reed Medical Records). When Reed first arrived in BOP custody in

11    early 2013, he was assessed by BOP medical staff and he indicated that he had both hypertension and

12    adult-onset, non-insulin-dependent diabetes. *Id*. at F300.[2] To manage these conditions, Reed was given

13    prescriptions of glyburide and metformin for his diabetes as well as Lisinopril for his hypertension. *Id*.

14    at F297. His medical records indicate that he was first diagnosed with diabetes and hypertension in

15    2012. *Id*. at F132 ("Patient told he has Hypertension in 2012."); F290 ("Knows to be diabetic for one

16    year."). On April 18, 2013, his doctor noted that Reed's "blood pressure seems to be normal" while

17    taking Lisinopril. *Id*. at F290. Reed's medical records from this time period show that his diabetes and

18    his hypertension were both "improved." *Id*. at F292. By May 2013, Reed had asked to discontinue

19    taking glyburide for his diabetes, but said he would continue with metformin. *Id*. at F285. One month

20    later, in June 2013, Reed's physician indicated that Reed was "most likely borderline diabetic," and

21    "[h]is blood pressure is now normal." *Id*. at F281.

22        In January 2014, Reed's doctor noted that Reed had "mild type II" diabetes, but that Reed had

23    lost 10 pounds, was now exercising more, and was "interested in getting off medication." *Id*. at F232;

24    *see also* F233 ("Wants to see how he does off [diabetes] meds."). For his hypertension, Reed's doctor

25    wrote that Reed was at his "treatment goal." *Id*. at F233. Based on the results of his January 2014

26

27        [2] Reed's medical records are extensive. To assist the Court in easily locating information
referenced in this brief, undersigned counsel has numbered the pages of Attachment F (F1 through

28    F343).

1 checkup, Reed's doctor ended his prescription of metformin for diabetes. *Id*. at F234.  Reed continued

2 taking Lisinopril. *Id*. at F233.  A few months later, in May 2014, Reed's doctor noted that Reed "has

3 not been taking his antihypertensives for 6 months" and that Reed denied having chest pain or shortness

4 of breath. *Id*. at F225.  His doctor also indicated that Reed had not been taking diabetes medication for

5 six months. *Id*.  Based on his May 2014 exam, Reed's hypertension was improved enough to

6 discontinue taking Lisinopril, and his diabetes diagnosis was updated to "resolved" in his medical

7 records. *Id*. at F227.  By December 2014, however, Reed's doctor indicated that Reed's blood pressure

8 was elevated, but he was not experiencing any chest pain, shortness of breath, cough, or swelling. *Id*. at

9 F219.  Reed asked to be given medication to manage his hypertension. *Id*.  He was prescribed

10 hydrochlorothiazide. *Id*. at F220.

11      Three months later, in February 2015, Reed told his doctor that he had stopped taking

12 hydrochlorothiazide because it was making him dehydrated. *Id*. at F180.  Reed denied having any

13 symptoms and was instructed to notify his provider if his blood pressure exceeded a set level. *Id*. at

14 F180-81.  On his next doctor's visit on April 6, 2015, Reed's doctor wrote that Reed "has had periods of

15 noncompliance in the past" with regard to taking his hydrochlorothiazide. *Id*. at F175.  Reed was

16 advised to avoid salt in his diet, *id*., and his prescription for hydrochlorothiazide was renewed. *Id*. at

17 F178.

18      Reed's medical records show that Reed again stopped taking hydrochlorothiazide in October

19 2015 "because he has been exercising and watching his salt and sodium intake." *Id*. at F132.  In an

20 April 2016 follow up with Reed, his doctor noted that "[n]o further treatment of hypertension is

21 indicated" and Reed "is considered normotensive at this time." *Id*.  His hypertension diagnosis was

22 changed to "resolved." *Id*. at F133; *see also id*. at F112-13 (indicating that Reed's diabetes diagnosis

23 was resolved in May 2014 and his hypertension was resolved in April 2016).

24      In each of the last several years, Reed has had multiple doctor visits for various health concerns,

25 including glaucoma, neck injury, sprained ankle, burns, and myopia. *See, e.g.*, *id*. at F7-8.  However, his

26 medical records indicate that he has not needed any care or treatment for his diabetes since May 2014

27 and since April 2016 for hypertension.

28

On February 11, 2020, Reed refused his flu vaccine.  *Id*. at F16.  On May 6, 2020, he tested negative for COVID-19.  *Id*. at F10.  BOP medical staff have been monitoring Reed daily since early May.  *Id*. at F3-4.  During that time, Reed has registered a fever only once, when his temperature was 99.9 degrees on May 9, 2020.  *Id*. at F3.  Every day since then his temperature has been between 97.2 and 97.6 degrees.  *Id*.  His oxygen saturation rate was 98 percent when measured on May 9.  *Id*. at F4.

Reed's records also reveal that, on May 8, 2020, he denied having muscle pain, cough, or fatigue, but he claimed that over the last six weeks he had experienced shortness of breath, headache, loss of taste or smell, and chills.  *Id*. at F3.  The following day, Reed denied any COVID-19 symptoms.  *Id*.  On May 13 and May 14, Reed was again asked about any symptoms he was experiencing, and he denied having shortness of breath, muscle pain, cough, fatigue, sore throat, headache, loss of taste and smell, and chills.  *Id*.

### D.      Reed's Request to the Warden for Compassionate Release

In a note to the warden at FCC Lompoc dated April 13, 2020, Reed requested to be placed "in immediate home confinement."  Rodriguez Decl., Ex. G (Reed Request).  The request was received by the warden on April 21, 2020.  *Id*.  In the request, Reed said he was a 38-year-old diabetic with high blood pressure who was fearful of contracting COVID-19.  *Id*.  He also said that he has a stable home where he could reside and the means to pay for electronic monitoring.  *Id*.  Reed did not say where he would live or with whom he would be staying.

In a memorandum dated April 14, 2020, the acting complex warden at FCC Lompoc denied Reed's request for compassionate release.[3]  Rodriguez Decl., Ex. H (Warden Memo. to Reed).  The memorandum indicated that BOP was "taking extraordinary measures to contain the spread of COVID-19 and treat any infected inmates."  *Id*.  It further noted that Reed's concerns about contracting the virus

---

[3]  Based on the documents provided by BOP to the government, the chronology of Reed's request to the warden and the warden's response is not clear.  Reed's request is dated April 13, 2020, and the document includes a file stamp showing it was received by the warden's office on April 21, 2020.  However, the warden's response to Reed is dated April 14, 2020.  While undersigned counsel is uncertain of the reasons that the warden responded to a request seven days before the file stamp indicates it was received, as we explain on the following pages, this uncertain chronology has no effect on jurisdiction or on the Court's ability to decide Reed's motion.

1  did "not currently warrant an early release from your sentence."  *Id*.  Reed was advised that he could

2  appeal this decision via the administrative remedy process, but to date he has not done so.

3  ### ARGUMENT

4  ## II.   THIS COURT MAY NOT DESIGNATE REED TO HOME CONFINEMENT

5          In his motion and supplemental memorandum, Reed appears to request that the Court order him

6  to home confinement.  *See, e.g.*, Def. Mot. at 1 (stating Reed would "like to be considered for early

7  release to home confinement"); Def. Supp. Memo. at 1 (requesting "an order modifying [Reed's]

8  sentence to allow him to serve the balance in home confinement").  However, as the Court knows well,

9  only the BOP, pursuant to its exclusive authority under 18 U.S.C. § 3624(c), can designate where Reed

10  serves his existing custodial sentence.  The BOP has exclusive authority to determine the location where

11  an inmate serves his or her custodial sentence, including whether transfer from a secure facility to home

12  confinement is more appropriate for a particular defendant.  *See Tapia v. United States*, 564 U.S. 319,

13  331 (2011) ("When a court sentences a federal offender, the BOP has plenary control, subject to

14  statutory constraints, over [the place of imprisonment and treatment programs].")*; United States v.*

15  *Ceballos*, 671 F.3d 852, 855 (9th Cir. 2011) (per curiam) ("The Bureau of Prisons has the statutory

16  authority to choose the locations where prisoners serve their sentence."); *Reeb v. Thomas*, 636 F.3d

17  1224, 1226 (9th Cir. 2011) ("Congress delegated to the BOP the duty to manage and regulate all federal

18  penal and correctional institutions.").  Although this Court may make a non-binding recommendation to

19  BOP as to home confinement, BOP's designation decision "is not reviewable by any court."  18 U.S.C.

20  §§ 3621(b) & 3624(c); *see, e.g.*, *United States v. Jones*, No. CR 17-070 VC, Dkt. 93 (N.D. Cal. Apr. 10,

21  2020) (denying defendant's motion for compassionate release but recommending BOP place defendant

22  in home confinement); *United States v. Fobbs*, No. 19-CR-410 WHA, Dkt. 32 (N.D. Cal. Apr. 7, 2020)

23  (recommending BOP place defendant in home confinement).

24          Accordingly, to the extent Reed is requesting that the Court order BOP to designate his home as

25  the location for his incarceration, the Court is without power to do so.

26  ///

27  ///

28  ///

GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE
CR 12-161 YGR                                                                7

III.   **REED HAS EXHAUSTED HIS ADMINISTRATIVE REMEDIES, WHICH IS A JURISDICTIONAL REQUIREMENT**

  A. **More than 30 Days have Passed Since Reed's Informal Request for a Modification of His Sentence was Received by FCC Lompoc's Warden**

   Pursuant to 18 U.S.C. 3582(c)(1)(A), a court may not modify a term of imprisonment once it has been imposed until after either (1) a defendant has fully exhausted their administrative rights to appeal a failure of BOP to bring a motion on the defendant's behalf, or (2) at least 30 days has elapsed since the warden at the defendant's facility received the defendant's request for a reduction in sentence.  Here, Reed's request was received by the warden's office on April 21, 2020.  Rodriguez Decl., Ex. G (Reed Request).  As of May 21, 2020, at least 30 days has elapsed, and therefore the Court possesses jurisdiction to decide Reed's motion.

  B. **The First Step Act Requires Exhaustion of Administrative Remedies, Which is a Jurisdictional Limitation**

   Contrary to Reed's arguments, Def. Supp. Memo. at 8, the First Step Act requires exhaustion of administrative remedies, and failure to do so is a jurisdictional limitation for which there are no equitable exceptions.

   "'[A] judgment of conviction that includes [a sentence of imprisonment] constitutes a final judgment' and may not be modified by a district court except in limited circumstances." *Dillon v. United States*, 560 U.S. 817, 825 (2010) (quoting 18 U.S.C. § 3582(b)) (alterations in original).  It is well established that once a district court has pronounced sentence and the sentence becomes final, the court has no inherent authority to reconsider or alter that sentence.  Rather, it may do so only pursuant to statutory authorization.  *See, e.g.*, *United States v. Addonizio*, 442 U.S. 178, 189 & n.16 (1979); *United States v. Washington*, 549 F.3d 905, 917 (3d Cir. 2008); *United States v. Smartt*, 129 F.3d 539, 540 (10th Cir. 1997) ("A district court does not have inherent authority to modify a previously imposed sentence; it may do so only pursuant to statutory authorization.") (internal quotation marks omitted).

   Section § 3582(c) provides three narrow exceptions to the rule of finality, only the first of which is relevant here.  18 U.S.C. § 3582(c)(1)–(2).  Pursuant to 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act on December 21, 2018, a district court may not modify a term of imprisonment upon a

1   defendant's motion until either (1) "after the defendant has fully exhausted all administrative rights to

2   appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," or (2) "the lapse

3   of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is

4   earlier."  The Ninth Circuit has held that a defendant's failure to meet the requirements of 18 U.S.C. §

5   3582(c)(2) means that the district court lacks jurisdiction to reduce the defendant's sentence.  *United*

6   *States v. Buenrostro*, 895 F.3d 1160, 1164 (9th Cir. 2018); *United States v. Davis*, 825 F.3d 1014, 1019–

7   20 (9th Cir. 2016) (en banc).

8        While *judicially*-created exhaustion requirements may sometimes be excused by judge-created

9   exceptions, it is well settled that a court may not ignore a *statutory* command such as that presented in

10  Section 3582(c)(1)(A).  *See, e.g*, *Shaw v. Bank of America Corp.*, 946 F.3d 533, 541 (9th Cir. 2019)

11  ("[T]the Supreme Court has made clear that if exhaustion 'is a statutorily specified prerequisite'—as

12  opposed to a judicially created one—'[t]he requirement is . . . something more than simply a

13  codification of the judicially developed doctrine of exhaustion, and may not be dispensed with merely

14  by a judicial conclusion of futility[.]'" (quoting *Weinberger v. Salfi*, 422 U.S. 749, 755 (1975)).

15       Reed's argument that "the majority" of courts have found the exhaustion requirement is non-

16  jurisdictional is unfounded.  Def. Supp. Memo. at 8.  As an initial matter, the lone case Reed cites to

17  support this claim is from the Western District of New York, and the cases relied upon by that court in

18  making this assertion are all from the Southern District of New York.  *United States v. Bess*, No. 16-CR-

19  156, 2020 WL 1940809, at *3 (W.D.N.Y. Apr. 22, 2020).  Numerous other courts, including most

20  judges in this district, have recognized that COVID-19 does not excuse the administrative requirements

21  of 18 U.S.C. § 3582(c)(1)(A).  *See, e.g.*, *United States v. Reid*, No. 17-CR-00175-CRB-1, Dkt. 547

22  (N.D. Cal. Apr. 18, 2020) (holding the court lacked jurisdiction to review defendant's claim for

23  compassionate release until administrative remedies had been exhausted); *United States v. Catledge*, No.

24  12-CR-00678-MMC-1, Dkt. 433 (N.D. Cal. Apr. 16, 2020) (denying COVID-19-based compassionate-

25  release motion for lack of exhaustion); *United States v. Hembry et al.*, No. 12-CR-00119-SI-1, Dkt.

26  1723 (N.D. Cal. Apr. 10, 2020) (same); *United States v. Eberhart*, No. 13-CR-00313 PJH, Dkt. 64, 2020

27  WL 1450745, at *2 (N.D. Cal. Mar. 25, 2020) (same).  Although "it is indisputable that the COVID-19

28  outbreak is unprecedented and poses a heightened risk to those in this nation's prisons and jails, [ ]

GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE
CR 12-161 YGR                                    9

absent congressional action to relieve inmates of the exhaustion requirement [of Section 3582(c)(1)(A), this Court] is unable to provide the relief Defendant seeks." *United States v. Holden*, No. 13-CR-00444-BR, 2020 WL 1673440, at *1 (D. Or. Apr. 6, 2020).

If Congress had intended to abandon the requirement of exhaustion due to the COVID-19 outbreak, the CARES Act signed into law on March 27, 2020 would have altered 18 U.S.C.§ 3582, but it did not. *See* Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (March 27, 2020). Thus, only after 30 days from the BOP's receipt of a defendant's request can a court consider a defendant's motion. 18 U.S.C. § 3582(c)(1)(A)(i). COVID-19 does not alter this conclusion, as numerous courts have recognized. Absent such exhaustion, a court "does not have authority to grant the requested relief." *United States v. Sloane*, No. 19-CR-10117-IT-11, Dkt. 647, at 2 (D. Mass. Mar. 19, 2020) (noting no request had been made to the USP Lompoc warden); *see also United States v. Shah*, No. 10-CR-70-CJC, Dkt. 329 (C.D. Cal. Mar. 30, 2020) ("Because defendant failed to exhaust his administrative remedies, his request for compassionate release based on COVID-19 concerns fails."); *United States v. Gileno*, No. 19-CR-161-VAB-1, 2020 WL 1307108, at *3-*4 (D. Conn. Mar. 19, 2020) (denying COVID-19-based compassionate-release motion for lack of exhaustion); *United States v. Neman*, No. 14-CR-521-JAK, Dkt. 863, at 4-6 (C.D. Cal. Mar. 30, 2020) (same).

## IV.    REDUCTION OF REED'S SENTENCE IS NOT WARRANTED

### A.    The Sentencing Commission's Policy Statements Are Controlling

This Court may reduce a sentence pursuant to 18 U.S.C. § 3582(c)(1)(A) only if, "after considering the factors set forth in section 3553(a) to the extent that they are applicable," the Court "finds that" either "extraordinary and compelling reasons warrant such a reduction," or the defendant is at least 70 years old and has served at least 30 years in prison, "and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." *See United States v. Robinson*, No. 18-CR-00597 RS, Dkt. 33 (N.D. Cal. Apr. 27, 2020). Congress explicitly gave authority to the Sentencing Commission to further describe what conduct would authorize a court to order compassionate release. Specifically, 28 U.S.C. § 994(t) states that the Sentencing Commission "shall

describe what should be considered extraordinary and compelling reasons for sentence reduction" under § 3582(c)(1)(A), "including the criteria to be applied and a list of specific examples."

The pertinent policy statement is set forth in § 1B1.13 of the United States Sentencing Guidelines (U.S.S.G.).  In the Application Notes, the Sentencing Commission provided explicit examples of what constitutes an "extraordinary and compelling circumstance":

(A)    **Medical Condition of the Defendant.**—

    (i)    The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory).  A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required.  Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

    (ii)    The defendant is—

        (I)    suffering from a serious physical or medical condition,

        (II)    suffering from a serious functional or cognitive impairment, or

        (III)    experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B)    **Age of the Defendant** — The Defendant is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the ageing process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment; whichever is less.

(C)    **Family Circumstances.** —

    (i)    The death or incapacitation of the caregiver of the defendant's minor child or minor children.

    (ii)    The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or the registered partner.

U.S.S.G. § 1B1.13 cmt. n.1.[4]

---

[4]  Application Note 1(D), the final example listed by the Sentencing Commission, is inapplicable to this situation.  It provides as follows:  "**Other Reasons.** — As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)."  U.S.S.G. § 1B1.13 cmt. n.1.  In turn, BOP promulgated Program Statement 5050.50, amended effective January 17, 2019, to set forth its own internal criteria for evaluating compassionate release requests.  *See* https://www.bop.gov/policy/progstat/5050_050_EN.pdf.  In this case, the Director of BOP did not identify any "extraordinary and compelling reason" under this application note.

1    Thus, in order to qualify for compassionate release after having exhausted his or her

2    administrative remedies with the Bureau of Prisons, a defendant must be able to demonstrate one of the

3    listed reasons in (A)–(C) above.  A defendant bears the burden to show special circumstances meeting

4    the high bar set by Congress and the Sentencing Commission for compassionate release to be granted.

5    *See United States v. Greenhut*, 2020 WL 509385, at *1 (C.D. Cal. Jan. 31, 2020) (holding that defendant

6    bears the burden of establishing entitlement to sentencing reduction and citing *United States v. Sprague*,

7    135 F.3d 1301, 1306-07 (9th Cir. 1998)).

8    For that reason, to state a cognizable basis for a sentence reduction based on a medical condition,

9    Reed first must establish that his condition falls within one of the categories listed in the policy

10   statement.  Those categories include, as particularly relevant here, (i) any terminal illness, and (ii) any

11   "serious physical or medical condition . . . that substantially diminishes the ability of the defendant to

12   provide self-care within the environment of a correctional facility and from which he or she is not

13   expected to recover."  U.S.S.G. § 1B1.13 cmt. n.1(A).  If a defendant's medical condition does not fall

14   within one of the categories specified in the application note (and no other part of the application note

15   applies), his or her motion must be denied.

16   The existence of the COVID-19 pandemic, which poses a general threat to every non-immune

17   person in the country, does not by itself fall into either of those categories and therefore could not alone

18   provide a basis for a sentence reduction.  *See United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020)

19   (holding that the existence of COVID-19 alone does not constitute a basis for granting compassionate

20   release).  Nor would a defendant's chronic but manageable underlying medical condition, alone,

21   constitute "extraordinary and compelling" circumstances.  Indeed, before the outbreak of COVID-19,

22   district courts addressing § 3582(c)(1)(A) claims routinely noted:  "To be faithful to the statutory

23   language requiring 'extraordinary and compelling reasons,' it is not enough that Defendant suffers from

24   . . . chronic conditions that [he] is not expected to recover from.  Chronic conditions that can be

25   managed in prison are not a sufficient basis for compassionate release."  *United States v. Ayon-Nunez*,

26   2020 WL 704785, at *2–3 (E.D. Cal. Feb. 12, 2020) (rejecting a claim for compassionate release from a

27   defendant suffering from severe back injuries and epilepsy) (quoting *United States v. Weidenhamer*,

28   2019 WL 6050264, at *5 (D. Ariz. Nov. 8, 2019)).  Compassionate release is "rare" and "extraordinary"

GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE
CR 12-161 YGR                                      12

1   and courts routinely denied such claims prior to the current national emergency.  *United States v.*

2   *Mangarella*, 2020 WL 1291835, at *2–3 (W.D.N.C. Mar. 16, 2020) ("[A] compassionate release . . . is

3   an extraordinary and rare event." (citation omitted)).

4          Accordingly, this Court may not reduce Reed's sentence unless it finds that "extraordinary and

5   compelling reasons," as defined by U.S.S.G. § 1B1.13, exist, warranting such reduction.  For the reasons

6   set forth below, Reed fails to meet this standard.

7          **B.      Reed is a Danger to the Community**

8          The Sentencing Commission's policy statement explicitly prohibits this Court from reducing a

9   defendant's sentence unless the Court determines that "the defendant is not a danger to the safety of any

10  other person or to the community, as provided in 18 U.S.C. § 3142(g)."  U.S.S.G. § 1B1.13; *see also*

11  *United States v. Cazarez*, No. 15-CR-00362-CRB-1, Dkt. 78 (N.D. Cal. May 4, 2020) (denying

12  compassionate release claim due to danger).  Those familiar standards include: (1) the nature and

13  circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the

14  history and characteristics of the defendant, and (4) the nature and seriousness of the danger to any

15  person or the community that would be posed by the person's release.  *See* 18 U.S.C. § 3142(g)(1)–(4).

16         Reed committed the offense conduct when he was 30 years old.  Between the ages of 18 and 30,

17  Reed racked up five felony convictions, three misdemeanor convictions, and 15 other arrests that did not

18  result in convictions.  PSR ¶¶ 24-30, 38-52.  His prior felonies were for narcotics and for possession of a

19  firearm, and they resulted in Reed being deemed a career offender pursuant to U.S.S.G. § 4B1.1.  But it

20  is likely that even this substantial criminal record fails to fully capture the criminality associated with

21  Reed's past.  The only legitimate job that Reed ever had was delivering pizzas for Domino's when he

22  was a teenager in 1997 or 1998.  PSR ¶ 74-75.  This means that, as an adult, Reed has never held a job,

23  and he has admitted that he supported himself by selling drugs.  *Id*.  His arrest in 2012 confirmed not

24  only that Reed was selling significant amounts of crack cocaine, PSR ¶ 10, but that he was doing so

25  while armed with a pistol equipped with a large capacity magazine.  PSR ¶ 9.  The serious nature of this

26  crime as well as Reed's extensive criminal history resulted in Probation recommending a sentence of

27  262 months.  *See* PSR Recommendation.

28         Reed's motion does not seriously address his danger to the community, nor does it address the

fact that he was twice convicted for illegally possessing firearms.  Moreover, in his request to the warden, Reed asserted that he had "maintained clear conduct," but even this was not true.  Rodriguez Decl., Ex. G (Reed Request).  Just two years ago Reed was sanctioned when he gave a letter to another inmate to mail, which was a violation of prison rules.  Rodriguez Decl., Ex. I (Inmate Discipline Data).  When prison officials reviewed the letter that Reed was trying to send, they found that it was addressed to a family member and requested information about the technical specifications of a body scanner.  *Id*.  Reed lost 27 days of good conduct time for these offenses and he was placed in disciplinary segregation.  *Id*.  This behavior is a far cry from maintaining "clear conduct" while in prison.

But even if Reed had been a model prisoner, the standard for compassionate release is not whether an inmate has been rehabilitated.  *See* U.S.S.G. § 1B1.13 n.3 ("Pursuant to 28 U.S.C. § 994(t), rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement.").  Instead, Reed must show that he will not be a danger if released.  He has failed to do that, and because he remains a danger to the community, he should remain incarcerated.  The nature and seriousness of the danger to the community that would be posed by Reed's release is clear:  Reed is a longtime drug dealer who has twice been convicted for possessing firearms, and his previous convictions had no deterrent effect on his behavior.  For the community's protection, Reed should remain in custody for the duration of his sentence.

## C.     <u>Reed Has Not Presented Extraordinary and Compelling Reasons for His Release</u>

In his handwritten motion to the Court, Reed asserted that although he has been diagnosed with diabetes, "the medical staff at FCI Lompoc . . . have chose[n] to leave it unchecked."  Def. Mot. at 1.  Similarly, in his supplemental memorandum, Reed's claims to have a "long-standing diagnosis of Diabetes Mellitus Type II."  Def. Supp. Memo. at 1.  Both of these claims are completely unsupported by Reed's medical records.  First, although he was formerly diagnosed with diabetes, that diagnosis was resolved six years ago, in May 2014.  Rodriguez Decl., Ex. F (Reed Medical Records) at F227.  BOP medical staff noted that Reed was diagnosed with diabetes in 2012, meaning that Reed was diabetic for approximately two years.  *Id*. at F290.  Even when that diagnosis was still active in 2013, Reed was only "most likely borderline diabetic."  *Id*. at F283.

///

1    In January of 2014, Reed told his doctor that he was interested in getting off his medication, and

2    that he was exercising more and had lost 10 pounds.  *Id.* at F232.  That same month, Reed's doctor

3    discontinued Reed's prescription for his diabetes medication and also noted that Reed's diabetes was

4    "mild."  *Id.*  By May of 2014, Reed informed his doctor that he had not taken his diabetes medication in

5    six months, *id.* at F225, and the status of his diabetes diagnosis was changed to "resolved."  *Id.* at F227.

6    At no point in the intervening years since May 2014 has Reed sought treatment for his diabetes, and at

7    no point have doctors determined there was a recurrence.  Blood work testing that was conducted in

8    October 2014 and May 2015—well after Reed had stopped taking his diabetes medication—did not

9    indicate his diabetes had returned.  *Id.* at F255, F208.  In sum, Reed does not have a "long-standing

10   diagnosis" of diabetes, Def. Supp. Memo. at 1, and the only reason that BOP medical staff have left this

11   condition "unchecked," Def. Mot. at 1, is because it has been fully resolved for more than half a decade.

12   While the Centers for Disease Control and Prevention ("CDC") lists people with diabetes as

13   being at a higher risk for severe illness from COVID-19, the CDC says nothing about people like Reed

14   whose diabetes has been in remission for several years.  *See* https://www.cdc.gov/coronavirus/2019-

15   ncov/need-extra-precautions/people-at-higher-risk.html.  Indeed, the CDC guidance suggests that

16   individuals most at risk are those with a diabetes condition that is "not well controlled."  *Id.*  This

17   information is similar to the guidance provided by the American Diabetes Association, which explains

18   that the "risk of getting very sick from COVID-19 is likely to be lower if your diabetes is well-

19   managed."  *See* https://www.diabetes.org/coronavirus-covid-19/how-coronavirus-impacts-people-with-

20   diabetes.  Even one of the sources Reed relies upon, Def. Supp. Mem. at 4, explicitly states that "the

21   severity of diabetes is positively correlated" with a poor COVID-19 prognosis.  *See* "Diabetes is a Risk

22   Factor for the Progression and Prognosis of COVID -19," *available at*

23   https://doi.org/10.1002/dmrr.3319.  While the scientific community seems to be in agreement that severe

24   and poorly managed diabetes often results in worse COVID-19 outcomes, Reed offers no support for the

25   notion that a person whose diabetes has been in remission for multiple years is likely to suffer the same

26   fate.

27   Likewise, Reed's former diagnosis of hypertension also does not qualify as an extraordinary or

28   compelling reason for release.  In 2012, Reed was informed that he had hypertension, but by October

1    2015, Reed no longer needed medication for this condition because he had improved his diet and

2    exercise.  Rodriguez Decl., Ex. F (Reed Medical Records) at F132.  Six months later, in April 2016, his

3    doctor noted that no further treatment for hypertension was needed as Reed was "normotensive."  *Id*. at

4    F132.  According to his medical records, since April 2016, Reed has not sought, needed, or received any

5    medical treatment for his hypertension.

6            Reed has cited no authority suggesting that a person who previously had hypertension is at

7    greater risk of experiencing severe complications from COVID-19.  But even if Reed's hypertension

8    diagnosis was current, that diagnosis alone would not be an extraordinary and compelling reason for his

9    release from custody.  The CDC has noted that "[n]early half of adults in the United States (108 million,

10   or 45%) have hypertension," which demonstrates that this is not an extraordinary condition.

11   https://www.cdc.gov/bloodpressure/facts.htm.  Moreover, the American Journal of Hypertension

12   ("AJH") has noted that, while hypertension is the most common comorbidity associated with increased

13   risk of COVID-19 infection, this does not "imply a causal relationship between hypertension and

14   COVID-19 or its severity, since hypertension is exceedingly frequent in the elderly, and older people

15   appear to be at particular risk of being infected with [the] virus and of experiencing severe forms and

16   complications of COVID-19."  *See* https://academic.oup.com/ajh/article/33/5/373/5816609.  AJH also

17   concluded that "there is as yet no evidence that hypertension is related to outcomes of COVID-19."

18   Therefore, even if Reed had hypertension—which he does not—nothing in the developing science of

19   COVID-19 indicates a causal relationship between hypertension and severe complications from

20   infection.

21           While Reed is correct that FCC Lompoc has had a high number of confirmed cases over the last

22   few weeks, BOP expected this outcome when it announced that all inmates at FCI Lompoc would be

23   tested.  Rodriguez Decl., Ex. E (May 5, 2020 BOP Press Release) ("Testing of 100% of the inmate

24   population at FCI Lompoc may significantly increase the number of COVID-19 positive cases reflected

25   on the Bureau of Prisons' public website.").  BOP's decision to drastically increase the number of tests

26   provided to inmates is part of its overall mitigation efforts, which have been substantial.  In just under

27   four weeks, BOP finalized construction of a completely new HCU to provide medical care for FCC

28   Lompoc inmates, and it also negotiated a contract for a number of new medical personnel to assist with

1    the outbreak.  Rodriguez Decl., Ex. C (May 4, 2020 BOP Press Release).  Because the inmates at low-

2    security FCI Lompoc were more susceptible to contracting COVID-19 due to that facility's dormitory

3    setting, BOP officials also repurposed the gymnasium, chapel, visiting room, and a decommissioned

4    factory to create additional housing space for inmates.  Rodriguez Decl., Ex. E (May 5, 2020 BOP Press

5    Release).  Moreover, strict new procedures to mitigate risk were instituted throughout FCC Lompoc,

6    including mandatory screening of staff and inmates and the distribution of personal protective

7    equipment.  *Id*.; *see also* Rodriguez Decl., Ex. D (April 17, 2020 Von Blanckensee Memo.).

8          BOP's actions to combat COVID-19 at FCC Lompoc are already proving effective.  As of May

9    22, 2020, there are a total of 348 inmates with an active diagnosis.  *See*

10    https://www.bop.gov/coronavirus/ (showing 291 inmates at FCI Lompoc and 57 inmates at USP

11    Lompoc with an active diagnosis of COVID-19).  Just four days earlier, on May 18, 2020, there were

12    942 active cases at the prison.[5]  In sum, FCC Lompoc has moved quickly to limit exposure and to

13    provide comprehensive treatment to infected patients, and these actions have substantially reduced the

14    number of active COVID-19 diagnoses at the prison.

15          FCC Lompoc's efforts to mitigate exposure and provide comprehensive care are evident in

16    Reed's own medical records.  Earlier this month, Reed told doctors that over the previous six weeks he

17    had experienced shortness of breath, headache, loss of taste or smell, and chills.  Rodriguez Decl., Ex. F

18    (Reed Medical Records) at F3.  On May 6, Reed was tested for COVID-19, *id*. at F10, and then he was

19    quarantined on the following day.  *Id* at F7.  Even after his COVID-19 results were found to be negative,

20    for the next 10 days BOP medical staff monitored Reed's temperature and checked him for symptoms.

21    *Id*. at F3.  On May 9, his oxygen saturation rate was 98 percent.  *Id*. at F4.  According to his most recent

22

23          [5]  In a government brief opposing a compassionate release motion before Judge Donato,

24    undersigned counsel confirmed that, on May 18, 2020, there were 942 active COVID-19 cases at FCC
Lompoc according to the BOP website.  *United States v. Zahn*, No. CR 18-150 JD, Dkt. 51 (May 18,

25    2020).  Higher numbers of active cases at the prison have also been reported by numerous media outlets
over the last two weeks.  *See, e.g.*, https://santamariatimes.com/news/local/13-additional-covid-19-

26    cases-confirmed-in-community-one-at-lompoc-prison/article_393be49e-39e8-5664-b87d-
bed75627b476.html (reporting 798 active cases at FCC Lompoc);

27    https://www.washingtonpost.com/national/these-towns-love-their-federal-prison-but-covid-19-is-
straining-the-relationship/2020/05/08/68e93702-9084-11ea-9e23-6914ee410a5f_story.html (indicating

28    that 905 prisoners at FCC Lompoc has tested positive for COVID-19).

medical records, Reed is still in quarantine even though COVID-19 was "ruled out."  *Id*. at F7.  These comprehensive efforts directly rebut Reed's assertion that FCC Lompoc medical staff are leaving Reed's health conditions "unchecked" or that the BOP is refusing "to undertake necessary preventive measures."  Def. Mot at 1; Def. Supp. Memo. at 2.  Rather, the record reflects that officials at FCC Lompoc are taking aggressive measures to protect inmates and to mitigate exposure of the virus.

While people around the world are understandably panicked about potential COVID-19 exposure, there is nothing to suggest that Reed's condition or circumstances warrant compassionate release.  Because Reed has failed to demonstrate extraordinary and compelling reasons as required by 18 U.S.C. § 3582(c)(1)(A), the Court should deny his request for relief.

### D.   Section 3553(a) Factors Weigh Against Reed's Release

After serving only about half of his 180-month sentence, Reed seeks to be released to home confinement.  As the Court is well aware, any compassionate-release decision also must consider the factors under 18 U.S.C. § 3553(a).  *See* 18 U.S.C. § 3582(c)(1)(A)(i).  Those factors do not support Reed's request for premature, permanent release.

Of the Section 3553(a) factors, worth singling out for discussion in this case are the following factors: (1) the history and characteristics of the defendant; (2) the need to protect the public from further crimes from the defendant (specific deterrence); and, (3) the nature and circumstances of the offenses.  Foremost, with regard to Reed's history and characteristics, he is by definition a career offender, and his sentence of 180 months reflected that designation.  As an adult, he has never held a job and he admitted to Probation that he supported himself by selling narcotics.  PSR ¶¶ 74-75.  He is, for all intents and purposes, a drug dealer by trade, which is confirmed by his significant criminal history.  PSR ¶¶ 24-52.  His previous convictions apparently had no deterrent effect on him, and there is nothing in Reed's motion or supplemental memorandum to indicate how he would support himself if he were released.  While Reed claims that he is needed at home "to help out financially," Def. Mot. at 2, he fails to explain what kind of work he would pursue or what skills he now possesses that would make him qualified for a particular line of work.  After Reed was previously convicted of four felonies, he went right back to selling drugs and was caught again in 2012, only this time he was armed with a gun

1  containing a high capacity magazine.  There is nothing in Reed's motion or supplemental memorandum

2  to suggest that his fifth felony conviction—the offense conduct—will result in a different outcome.

3       The risk that Reed will revert to drug dealing if he is released also speaks to two other factors in

4  the Section 3553(a) analysis:  the need to protect the public from further crimes from the defendant, and

5  the nature and circumstances of the offenses.  Dealing drugs is, of course, a very serious crime, and the

6  victims of drug dealing are legion—from the addicts themselves, who ruin their health and relationships,

7  to community residents who must cope with the crime, poverty, and other consequences of drug dealing.

8  *See also United States v. Lopez*, 104 F.3d 1149, 1151 (9th Cir. 1997) (noting that "[n]arcotics trafficking

9  enables traffickers to reap illicit financial gains and inflict the detrimental effects of narcotics use upon

10  our society").  Given the substantial hurdles that exist if Reed were to seek legitimate employment as

11  well as his lack of a realistic plan for actually obtaining a job, the risk that Reed will return to drug

12  dealing upon release is too great to ignore.  This is not to suggest that every defendant convicted of a

13  drug offense is incapable of reform.  Here, however, Reed has failed to explain how this particular

14  felony conviction—his fifth—has decreased the risk that he recidivates, nor has he explained what steps

15  he will take to ensure that he does not revert to his previous behavior.

16       For all of these reasons, the law and the specific facts of this case do not warrant Reed's early

17  release after serving only half of his 180-month sentence.  Granting Reed's motion would undermine the

18  3553(a) factors, and releasing him to home confinement could re-expose the community to his

19  dangerous behavior.

20  **V.   IF THIS COURT MODIFIES REED'S SENTENCE – WHICH IT SHOULD NOT – THE**
21  **COURT SHOULD MODIFY THE SENTENCE TAKING INTO ACCOUNT THE MANY IMPORTANT INTERESTS AT PLAY**

22       Although the above discussion has set out that Reed is not entitled to any reduction in his

23  sentence, if the Court is nonetheless inclined to grant Reed's motion for release from custody, the Court

24  should substitute a term of probation or supervised release with a condition of home confinement for the

25  duration of Reed's current sentence of imprisonment (April 2025).  Releasing Reed outright would

26  inappropriately re-balance the Section 3553 factors of this case, particularly given that the present

27  conditions caused by the pandemic are likely impermanent.  For example, public reporting indicates that

28  various medical professionals around the world are in the process of developing a vaccine and

researching other methods of combatting the disease in the coming months.  *See, e.g.*,
https://www.nih.gov/news-events/news-releases/nih-clinical-trial-investigational-vaccine-covid-19-
begins.

Moreover, if the Court is inclined to grant his motion, before being released Reed should
demonstrate that his release plan will ensure a safe transition to the community.  Reed provided no
meaningful details about his release plans in his motion, and the Court should reject any plan proposed
by Reed that fails to account for the safety of the community.  It also is not clear that Reed's immediate
release would afford him unrestricted access to healthcare, or how soon he could obtain medical
coverage after he is released.  As his medical records indicate, Reed currently has a number of active
conditions that require medical attention.  Rodriguez Decl., Ex. F at F7.  It is extremely unlikely that
Reed would have the same unfettered access to comprehensive medical care if he was released from
BOP custody.

For these reasons, if the Court were to issue an order releasing Reed, the United States
respectfully asks that the Court: (1) order any release only after Reed's plans appropriately take into
account the community's safety as well as his own current and future health concerns; and, (2) include
in its order a provision that will accommodate the BOP's ability to quarantine Reed prior to his release
to protect the community from potential further spread if the BOP determines that such a quarantine is
necessary.

But as noted above, the United States contends that no such order should issue, as Reed should
not be released under any circumstances.

//

//

//

//

//

//

//

//

**CONCLUSION**

The United States urges the Court to deny Reed's motion for compassionate release.  Reed has failed to establish that there are extraordinary and compelling reasons warranting his release, and the danger he poses to the community is too significant to justify his release.


DATED:  May 22, 2020                                        Respectfully submitted,

                                                           DAVID L. ANDERSON
                                                           United States Attorney


                                                           _____/s/_____
                                                           MICHAEL A. RODRIGUEZ
                                                           Assistant United States Attorney